IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 14 CR 377 |
| v. | ) | |
| | ) | Hon. Amy J. St. Eve |
| FRANCISCO MAYORGA | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Defendant Francisco Mayorga ("Defendant") has moved to suppress 1) all physical evidence that the government obtained upon searching Defendant's vehicle on August 17, 2013 and 2) all written and oral communications, confessions, statements, or admissions that Defendant allegedly made during and after the aforementioned search on the grounds that the government obtained both in violation of his Fourth Amendment right to be secure from unreasonable searches and seizures under the United States Constitution. [49]. For the reasons stated below, the Court denies Defendant's motion.

### BACKGROUND

On July 30, 2014, a grand jury returned a two-count Indictment (the "Indictment") against Defendant. (R. 22.) Count One charges Defendant with knowingly and intentionally possessing with the intent to distribute a controlled substance, namely, 1,000 kilograms or more of a mixture and substance containing a detectable amount of marijuana, a Schedule I Controlled Substance, in violation of 21 U.S.C. § 841(a)(1). (*Id*.) Count Two charges Defendant with knowingly possessing a firearm, namely, a Colt Ace .22 caliber, semi-automatic handgun bearing serial number SM15084, and associated ammunition, in furtherance of a drug trafficking crime for which defendant may be prosecuted in a court of the United States, namely, possession with

intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1), as charged in Count One of the Indictment, in violation of 18 U.S.C. § 924(c)(1)(A). (*Id.*) The Indictment also contains a forfeiture allegation against Defendant. (*Id.*)

## ANALYSIS

Defendant asks the Court to suppress the physical evidence—namely, over 1,300 kilograms of marijuana and a .22 caliber semi-automatic handgun—that the government obtained from his vehicle on August 17, 2013, on the grounds that the government stopped and searched his vehicle in violation of his Fourth Amendment rights. In addition, Defendant asks the Court to suppress any and all written or oral communications Defendant allegedly made during and after the search, on the grounds that the predicate search and seizure was unconstitutional.

On March 22, 2016, the Court held a hearing on the motion.[1] During the hearing, the government called the following witnesses to testify: DEA Task Force Officer Donn Kaminsky, DEA Special Agent Robert Lukens, CPD Officer Angelo Panagiotopoulos, and DEA Task Force Officer Chris Marshall. Defendant testified as his only witness. The Court carefully assessed the testimony and demeanor of each witness during the hearing and makes its factual findings below.

### I. Legal Standard

"The Fourth Amendment protects citizens against unreasonable searches and seizures." *United States v. Richards*, 719 F.3d 746, 754 (7th Cir. 2013); *see also* U.S. Const. amend. IV. "The jurisprudence of the Supreme Court makes clear that the primary bulwark against such conduct is the procurement of a warrant from a neutral and detached magistrate." *United States*

---

[1] A suppression hearing is warranted only when the defendant presents a disputed issue of material fact that will affect the outcome of the motion. *See United States v. Curlin*, 638 F.3d 562, 564 (7th Cir. 2011). The government here conceded that a hearing was necessary given "contradictions between the law enforcement reports and the defendant's affidavit[.]" (R. 54, Response, at 2.)

*v. Whitaker*, 546 F.3d 902, 906 (7th Cir. 2008) (citing *Groh v. Ramirez*, 540 U.S. 551, 575, 124 S. Ct. 1284, 157 L. Ed. 2d 1068 (2004)).  Accordingly, "[a] warrantless search is per se unreasonable under the Fourth Amendment subject to a few well-established exceptions." *United States v. Zahursky*, 580 F.3d 515, 521 (7th Cir. 2009) (citing *Arizona v. Gant*, 556 U.S. 332, 338, 129 S. Ct. 1710, 173 L. Ed. 2d 485 (2009)).  Indeed, if law enforcement officials conduct a warrantless search, "the government must show by a preponderance of the evidence that the search fell within one of the recognized exceptions to the warrant requirement." *Id.* (citing *United States v. Basinski*, 226 F.3d 829, 833 (7th Cir. 2000)).

## II.     The Investigation and Subsequent Search and Seizure

On August 17, 2013, law enforcement officers discovered at least 1,300 kilograms of marijuana and a loaded Colt Ace .22 caliber semi-automatic handgun after searching and seizing Defendant and his vehicle.  As a result, Defendant is charged with knowingly and intentionally possessing with the intent to distribute 1,000 kilograms or more of a controlled substance.  In addition, Defendant is charged with knowingly possessing a firearm in furtherance of a drug trafficking crime.  Defendant seeks to suppress the physical evidence and any oral or written communications Defendant allegedly made on the grounds that the underlying search and seizure violated his Fourth Amendment rights under the Constitution.

### A.     Underlying Investigation

In July 2013, a Drug Enforcement Agency ("DEA") confidential source (the "CS") informed the DEA of an individual ("Individual A") trafficking large amounts of marijuana into the United States.  Indeed, the CS notified the DEA that Individual A was a mid-level broker who had previously supplied the CS with loads of up to fifty pounds of marijuana.

3

On July 12, 2013, the CS communicated to the DEA that Individual A had contacted the CS, informing him that a shipment with at least 2,000 pounds of marijuana was about to arrive in the Northern District of Illinois. According to the CS, Individual A planned to charge $650 per pound of marijuana. Throughout the following week, the CS, working with the DEA, conducted a number of recorded telephone calls and surveilled in-person meetings with Individual A. The lead, however, stopped there. Indeed, the DEA never learned of any 2,000 pound marijuana shipment in the Northern District of Illinois. Subsequently, the DEA learned that the CS had obtained a payment for drugs while supplying information, and the CS never communicated as much to the DEA. Consequently, the DEA deactivated the CS as a source.

On August 17, 2013, the CS again approached the DEA with information, and the DEA utilized the CS as a Source of Information ("SOI").[2] The CS informed the DEA that Individual A had called and asked the CS to assist Individual A with a 5,000 pound marijuana shipment, scheduled to arrive in Chicago that evening. Specifically, the CS reported that Individual A had instructed the CS to be at the corner of Archer and Western at 7:00 P.M. to receive an unknown quantity of marijuana. A DEA task force, using the CS and a second individual ("CS2"), whom the CS recruited for assistance, initiated an investigation.

The DEA first met with the CS and CS2 and then surveilled a meeting among them and Individual A in a Jewel Osco grocery store parking lot at Archer and Western – Individual A's alleged rendezvous point. The DEA did not record this meeting. Next, the DEA observed Individual A, the CS, and the CS2 depart from the Jewel parking lot in a Chevy Malibu and drive to a donut shop located on Archer and Damen. Subsequently, the Chevy Malibu returned to the Jewel parking lot, and the DEA observed Individual A, the CS, and the CS2 exit the vehicle.

---

[2] In an effort to avoid confusion, however, the Court will continue to refer to the individual as the "CS."

The CS and CS2 then entered their own vehicles and exited the Jewel parking lot. Individual A exited the Jewel parking lot about twenty minutes later in a Chrysler 300. The DEA surveilled the CS2's departure from the Jewel parking lot and tracked him to an area near the intersection of 28th Street and Western, where the CS2 parked. The CS2 subsequently called and informed the DEA that the CS2 was waiting for a call from Individual A, or someone affiliated with Individual A, advising the CS2 to enter a trucking yard.

About ten minutes after the DEA spoke with the CS2, the DEA observed the CS2 drive east on 28th Street toward the trucking lot located at the intersection of 28th Street and Leavitt. The inside of the trucking lot was out of the DEA surveillance team's sight. Approximately eight minutes later, the DEA observed the CS2 exiting the trucking lot in his vehicle. The Chicago Police Department ("CPD"), working with the DEA, then pulled the CS2's vehicle over and recovered 19 bundles of marijuana, weighing about 431 pounds total. Afterward, the DEA continued surveilling the trucking lot's entrance.

### B. August 17, 2013 Search and Seizure of Defendant and Defendant's Vehicle

At about 9:45 P.M., approximately forty-five minutes after the CPD pulled the CS2 over, the DEA observed a white cargo van pull out of the trucking yard. The evidence established that Defendant was driving the white cargo van. Law enforcement first observed Defendant drive west on 28th Street and then north on Western. Eventually, the DEA observed Defendant drive into a Speedway gas station on Western. Subsequently, the DEA called CPD Officer Panagiotopoulos. Officer Panagiotopoulos testified that the DEA task force sought his help in conducting surveillance and traffic stops during that evening's narcotics investigation. He further testified that the DEA, upon observing Defendant enter the gas station, notified him of the van and instructed him to pull it over. Officer Panagiotopoulos explained that, based on his

previous experience working with the DEA, it was CPD protocol to wait for drivers to commit a traffic violation in their presence to conduct a traffic stop. Here, the government and Defendant dispute whether Defendant was wearing a seatbelt.

Officer Panagiotopoulos testified that he observed Defendant driving the white cargo van without wearing a seatbelt. Specifically, Officer Panagiotopoulos testified that he and Officer Basile, his partner, were parked in their squad car facing northbound on Western, just across from the Speedway gas station. He first observed Defendant pulling out of the gas station toward them and turning northbound. Officer Panagiotopoulos noted that the gas station was "pretty lit." Accordingly, he was able to see that Defendant did not have his seatbelt fastened. Immediately, Officer Panagiotopoulos testified, they pulled Defendant over.

Defendant, however, testified that, before departing the trucking lot, he fastened his seatbelt, leaving it fastened the entire time he drove the van. Defendant further asserted that he only unfastened his seatbelt when he reached to get his driver's license from his pocket after the officers pulled him over. (*Id*. at ¶ 22.)

The Court credits Officer Panagiotopoulos's testimony and finds that Defendant was driving without his seatbelt fastened. The fact that the ticket Defendant received does not mention his seatbelt infraction does not convince the Court otherwise. Indeed, according to Officer Panagiotopoulos, the associated CPD arrest report does document the seatbelt violation. Further, Defendant admitted to driving into the Speedway gas station on 23rd Street and pulling up to a gas pump. (Tr. at 11–12.) Officer Panagiotopoulos credibly testified that the gas station was well-lit, allowing him to see Defendant driving without his seatbelt on. Notably, he further explained that CPD protocol was to wait for potential targets to commit traffic violations in their

presence before arresting them upon the DEA's instruction. Furthermore, the officer's previous experience working on similar investigations added to his credibility.

Further, the Court does not find Defendant's testimony credible. Indeed, Defendant's evasive manner while testifying and contradictory testimony reduced his credibility. When asked at the suppression hearing whether he had ever smoked marijuana, for example, Defendant responded, "that's incorrect." (Tr. at 36.) Specifically, when asked whether he told Pretrial Services that he "used marijuana on about a yearly basis and . . . last used it three weeks before . . . [the] arrest," Defendant answered, "[n]o." (*Id*. at 37.) According to the Pretrial Services report, however, Defendant informed Pretrial Services on July 3, 2014 that he used "[c]annabinoids" on a "yearly" basis, last using them "3 weeks ago." (R. 1, Pretrial Services Report, at 3.) Further, Defendant has a significant motive to lie. Defendant is seeking to suppress the admission of over three thousand pounds of marijuana, a substantial amount of drugs. As a result, he is charged, in part, with knowingly and intentionally possessing with the intent to distribute 1,000 kilograms or more of a mixture and substance containing a detectable amount of marijuana and faces a significant sentence of imprisonment. As such, the Court finds that Defendant committed a seatbelt traffic violation in Officer Panagiotopoulos's presence, despite Defendant's testimony to the contrary.

According to Officer Panagiotopoulos, he "immediately" smelled a pungent odor of marijuana emanating from Defendant's van after he pulled it over. Officer Panagiotopoulos then inquired whether Defendant had anything in the vehicle and asked Defendant to exit. Defendant then responded that he had a weapon in the van and exited. Officer Panagiotopoulos then led Defendant to the front of their CPD squad car, located behind Defendant's van. Upon searching the van, the CPD officers discovered a Colt .22 caliber semi-automatic handgun, loaded with

eight rounds, and over 1,300 kilograms of marijuana wrapped in bundles in the back. Law enforcement then arrested Defendant.

## III. Law Enforcement Did Not Violate Defendant's Fourth Amendment Rights

The Court now turns to the relevant Fourth Amendment inquiry at issue – whether law enforcement's warrantless search and seizure of Defendant's white cargo van was unreasonable and, as a result, unconstitutional. The Court assesses both in turn.

### A. The Seizure

"Under the Fourth Amendment, every search and seizure must be "reasonable," which normally entails some person-specific basis for suspicion." *United States v. Childs*, 277 F.3d 947, 950 (7th Cir. 2002) (citing *Indianapolis v. Edmond*, 531 U.S. 32, 121 S. Ct. 447, 148 L. Ed. 2d 333 (2000)). In the automobile context, "[t]he Fourth Amendment prohibits unreasonable . . . seizures, but the existence of probable cause renders traffic stops and resulting warrantless arrests permissible." *Williams v. Brooks*, 809 F.3d 936, 942 (7th Cir. 2016). Importantly, committing a crime in the presence of law enforcement provides the "person-specific basis for suspicion" required for a warrantless seizure to be reasonable. *See United States v. Burnside*, 588 F.3d 511, 517 (7th Cir. 2009) ("[P]olice may arrest an individual if they have probable cause to believe that the individual engaged in criminal conduct, as an arrest supported by probable cause is reasonable by its very nature."). The fact that the crime at issue is a minor one is irrelevant. *See Williams*, 809 F.3d at 942 ("[I]t is not a violation of the Fourth Amendment to arrest an individual for even a very minor traffic offense.") (citation and quotation marks omitted) (citing *Atwater v. City of Lago Vista*, 532 U.S. 318, 323, 121 S. Ct. 4536, 149 L. Ed. 2d 549 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment,

8

arrest the offender.")); *see also Jackson v. Parker*, 627 F.3d 634, 639 (7th Cir. 2010); *Burnside*, 588 F.3d at 517. Indeed, an "[a]rrest for a minor, non-jailable offense does not violate the Fourth Amendment." *Chortek v. City of Milwaukee*, 356 F.3d 740, 745 (7th Cir. 2004) (citing *Atwater* 532 U.S. at 354) ("Atwater's arrest satisfied constitutional requirements. There is no dispute that Officer Turek had probable cause to believe that Atwater had committed a crime in his presence. She admits that neither she nor her children were wearing seatbelts[.]")). Further, courts "'need only inquire whether the officer had probable cause to believe that a traffic violation occurred,' . . . not whether a violation actually occurred." *United States v. Reaves*, 796 F.3d 738, 741 (7th Cir. 2015) (quoting *United States v. Muriel,* 418 F.3d 720, 724 (7th Cir.2005)); *see also United States v. Dowthard,* 500 F.3d 567, 569 (7th Cir.2007) (quoting *United States v. McDonald,* 453 F.3d 958, 961–62 (7th Cir. 2006)) ("An officer has probable cause for a traffic stop when she has an 'objectively reasonable' basis to believe a traffic law has been violated.")

Here, Officers Panagiotopoulos and Basile had probable cause to seize Defendant. According to Officer Panagiotopoulos and the arrest report, Defendant was driving the white cargo van without a fastened seatbelt, in violation of 625 ILCS 5/12-603.1. Violating even minor traffic laws, such as failing to wear a seatbelt, in the presence of law enforcement provides probable cause for law enforcement officers to reasonably seize and arrest a person. *Williams*, 809 F.3d at 942 (citing *Atwater* 532 U.S. at 323). As a result, when Officer Panagiotopoulos witnessed Defendant driving without a fastened seatbelt, he had an "objectively reasonable basis" to believe Defendant had violated a traffic law in his presence. Thus, law enforcement's seizure did not violate Defendant's Fourth Amendment rights under the Constitution.

Defendant's argument to the contrary is unpersuasive. Specifically, Defendant argues that a CPD Officer's report "notes that the stop was 'pre-arranged with Chicago Police.'" (R. 55

at 1.) This report, concludes Defendant, "prove[s] that the seatbelt violation was fiction." (R. 49 at 12.) It does no such thing.

It is not mutually exclusive for law enforcement to previously plan on seizing Defendant in his automobile and to ultimately seize Defendant after witnessing him drive without a fastened seatbelt. "[I]f there was probable cause to make the stop, and if the stopping officer was acting with authority, the stop was not pretextual. 'So long as the police are doing no more than they are legally permitted and objectively authorized to do, an arrest is constitutional.'" *United States v. Willis*, 61 F.3d 526, 530 (7th Cir. 1995) (quoting *United States v. Trigg*, 878 F.2d 1037, 1041 (7th Cir. 1989)). Put differently, law enforcement's subjective intent behind the seizure is irrelevant. The Supreme Court has established that "the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." *Scott v. United States*, 436 U.S. 128, 136, 98 S. Ct. 1717, 56 L. ed. 2d 168 (1978) (citing *United States v. Robinson*, 414 U.S. 218, 94 S. Ct. 467, 38 L. Ed. 2d 427 (1973)). These "cases foreclose any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved. . . . Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Whren v. United States*, 517 U.S. 806, 813, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996); *see also United States v. Edwards*, 769 F.3d 509, 516 (7th Cir. 2014) ("Edwards's pretext argument [is] misplaced in the Fourth Amendment context. The reasonableness of a search does not depend on the officer's subjective motivations; the inquiry is, of course, *objective*.") (emphasis in original) (citing *United States v. Tinnie*, 629 F.3d 749, 753 (7th Cir. 2011) ("[I]n judging the constitutionality of a search or seizure, courts must look at the facts objectively")); *Whren v.*

*United States*, 517 U.S. 806, 812, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996) ("Not only have we never held, outside the context of inventory search or administrative inspection . . ., that an officer's motive invalidates objectively justifiable behavior under the Fourth Amendment; but we have repeatedly held and asserted the contrary.")).

Instead, the Court "look [s] to the record as a whole to determine what facts were known to the officer and then consider[s] *whether a reasonable officer in those circumstances* would have been suspicious.'" *Edwards*, 769 F.3d at 516 (quoting *Tinnie*, 629 F.3d at 753) (emphasis in original). Under the present circumstances, Officer Panagiotopoulos observed Defendant driving the white cargo van out of a well-lit gas station and down Western without a fastened seatbelt. Defendant's traffic violation in Officer Panagiotopoulos's presence provided the probable cause necessary to warrantlessly seize him and his automobile, regardless of whether the officer had a previously established, alternative motive for doing so. Thus, the seizure did not violate Defendant's Fourth Amendment rights.

### B.     The Search

The Court next turns to the subsequent search. Although"[a] warrantless search is per se unreasonable under the Fourth Amendment," there do exist "a few well-established exceptions." *Zahursky*, 580 F.3d at 521 (citing *Gant*, 556 U.S. at 338). One example is the "automobile exception." *See United States v. Edwards*, 769 F.3d 509, 514 (7th Cir. 2014) ("Another possible basis for the search is the automobile exception."). Under this exception, "[t]he police do not need a warrant to search a vehicle when they have probable cause to believe it contains evidence of criminal activity." *Id*. (citing *United States v. Nicksion*, 628 F.3d 368, 377 (7th Cir. 2010)). "Probable cause exists when[,] based on the known facts and circumstances, a reasonably

prudent person would believe that contraband or evidence of a crime will be found in the place to be searched." *Id*. (citing *United States v. Richards*, 719 F.3d 746, 754 (7th Cir, 2013)).

Here, Officer Panagiotopoulos states that he "immediately" smelled a "pungent" odor of marijuana emanating from Defendant's white cargo van after pulling it over. Smelling marijuana provides probable cause sufficient to trigger the automobile exception, making a warrantless search reasonable. *See United States v. Mosby*, 541 F.3d 764, 768 (7th Cir. 2008) ("Sergeant Mushinsky . . . smelled marijuana as he stood next to the minivan[.] . . . The smell was enough to give rise to probable cause to search the entire vehicle, including closed containers like the garbage bag.") (citations omitted); *see also United States v. Cherry*, 436 F.3d 769, 772 (7th Cir. 2006) ("We recognize that the government has inexplicably abandoned reliance on Officer Harris's testimony that he smelled marijuana—which seems a simple and compelling foundation for searching [Defendant] and ultimately the car including the trunk[.]") (citing *United States v. Wimbush*, 337 F.3d 947, 950-51 (7th Cir. 2003) (the smell of marijuana gave rise to probable cause for warrantless vehicle search)). Accordingly, when Officer Panagiotopoulos smelled marijuana coming from Defendant's white cargo van, he had probable cause to warrantlessly search it. As a result, law enforcement did not violate Defendant's Fourth Amendment rights when it searched his automobile without first seeking consent or a warrant.

Thus, the Court denies Defendant's motion to suppress physical evidence and oral and written communications, as neither the search nor seizure of Defendant's van violated Defendant's Fourth Amendment rights under the Constitution.

## CONCLUSION

For the foregoing reasons, the Court denies Defendant's motion to suppress the physical evidence and any oral or written communications.

DATED:  June 24, 2016                    **ENTERED**

                                                                  _____
                                                                  AMY J. ST. EVE
                                                                  United States District Court Judge